UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No.   21-cr-00165 (TSC) |
| DONA SUE BISSEY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**SENTENCING MEMORANDUM**

**Introduction**

On October 12, 2021, Ms. Dona Sue Bissey, pursuant to a guilty plea, will appear before this Court to be sentenced for Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  Ms. Bissey respectfully requests, after considering all the relevant sentencing factors, including 18 U.S.C. § 3553(a), the Court impose a sentence of not more than 18 months of probation, with the additional conditions of $500 in restitution and 40 hours of community service.

**RELEVANT FACTS AND BACKGROUND**

On December 19, 2020, following his loss in the 2020 presidential election, then-President Donald Trump announced a "Save America" rally to protest the results.[1]  The rally was set for January 6, 2021, the same date Congress was set to certify Joe Biden as the winner.  On the morning of January 6, 2021, attendees gathered at the Ellipse in anticipation of the rally's

---

[1]   President Trump announced the rally on Twitter, tweeting, "Big protest in D.C. on January 6th . . . Be there, will be wild!"  *See* Dan Barry and Sheera Frenkel, *'Be There. Will Be Wild!': Trump All but Circled the Date,* The New York Times (Jan. 6, 2021), available at https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html.

start.[2]  A number of speakers took to the stage, including high-profile figures in the Republican Party.  Representative Mo Brooks (R-Ala.) urged "American patriots" to "start taking down names and kicking ass."[3]  Katrina Pierson, President Trump's spokesperson during his 2016 campaign, stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or we will go after them."[4]  Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican lawmakers to challenge the election result and "punch back from Donald Trump."[5]  Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees to march on the Capitol to "stand up for this country and stand up for what's right."[6]  Kimberly Guilfoyle, former Fox News host, stated that she would "continue to hold the line" for Trump and would not "allow the liberals and the Democrats to steal our dream or steal our elections."[7]  Donald Trump, Jr. also spoke to the crowd, narrating that "You have an opportunity today: You can be a hero, or you can be a zero.

---

[2]   Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[3]   *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

[4]   *Id*.

[5]   *Id*.

[6]   *Id*.

[7]   *Id*.

And the choice is yours but we are all watching."[8]  Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "trial by combat."[9]

Finally, around noon, then-President Trump took to the stage.  For an hour, he bemoaned the election results, imploring attendees to "fight" for him:

> We will not let them silence your voices. . . we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen. . . And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. And we're going to the Capitol, and we're going to try and give.[10]

At approximately 12:30 p.m., even before President Trump concluded his speech, some of the rally attendees migrated from the Ellipse toward the Capitol.[11]  At approximately 12:50 p.m., they breached the outer barricades of the U.S. Capitol grounds.[12]  The U.S. Capitol Police officers, who had been stationed behind the newly breached barriers, retreated and called for backup from the Metropolitan Police Department (MPD) and National Guard.[13]  The MPD

---

[8] *Id*.

[9] *Id*.

[10] *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[11] *See* Dmitiy Khavin, et al., *Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol*, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html; *see also* Shelly Tan, et al., *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

[12] *Id*.

[13] *Id*.

arrived approximately 15 minutes later, mobilizing and moving from the South of the building to the West. But the National Guard did not respond for nearly four hours, during which time clashes between the first wave of protestors and police intensified.[14]

When then-President Trump concluded his remarks around 1:00 p.m., a second wave of protestors left the Ellipse and headed toward the Capitol. By the time they arrived, the outer barriers and fencing that had previously surrounded the Capitol grounds were largely displaced, giving them free access to join the first wave of protestors on the steps of the building.

Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol itself was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. This breach spurred the evacuation of members of Congress and the Vice President.[15] More than 30 minutes later, the Senate Wing Doors themselves were penetrated by the crowd, pushing Capitol Police officers back into the inside corridor as they tried to prevent further intrusion.[16]

A few minutes after the Senate doors were breached, Ms. Bissey, Anna Morgan-Lloyd and an older woman named "Linda"[17] walked through the open doors of the Capitol. Once inside the building, Ms. Bissey paused briefly in the corridor and then, holding on to her friends to avoid being separated by the crush of protestors, made her way to a nearby hallway. She

---

[14] *Id*.

[15] *Id*.

[16] *Id*.

[17] No one with the first name of "Linda" has been charged in connection with January 6, 2021, suggesting that Linda was either a fake name, is the product of a charging disparity, or that the government has been unable to identify her even with clear photographic evidence. *See* Capitol Breach Cases, available at https://www.justice.gov/usao-dc/capitol-breach-cases.

posed for a photograph with her friends and an unknown man carrying a Trump flag. Approximately 10 minutes later, Ms. Bissey exited the Capitol from the same door she entered. She and Anna Morgan-Lloyd walked back to their hotel room, and the next day, the pair drove home to Indiana.

On January 22, 2021, Ms. Morgan-Lloyd traveled to her local sheriff's office in Indiana to apply for a firearms permit. While officers processed her permit, an employee of the sheriff's office recognized Ms. Morgan-Lloyd, recalling that she had posted pictures from January 6 on Facebook. The employee conveyed that information to officers, who reviewed Ms. Morgan-Lloyd's publicly-available Facebook page containing pictures of her in and around the Capitol on January 6. Some of the photos "tagged" Ms. Bissey. Officers contacted the Federal Bureau of Investigation (FBI), which, unbeknownst to the officers, already had received a tip that Ms. Bissey participated in January 6.[18]

On February 23, 2021, a criminal complaint was filed in U.S. District Court for the District of Columbia charging Ms. Bissey and Ms. Morgan-Lloyd with four misdemeanor offenses related to their conduct on January 6. *See* ECF No. 1. The following day, Ms. Bissey was arrested at her hair salon. *See* ECF No. 9. She had her initial appearance in the U.S. District Court for the Southern District of Indiana and was released on personal recognizance with conditions.[19] *See* ECF No. 10.

On March 1, 2021, Ms. Bissey had an initial appearance in the U.S. District Court for the District of Columbia and, again, was released on personal recognizance with conditions. *See* ECF No. 5. The same day, the government filed an information charging Ms. Bissey with the

---

[18]   That tip originated from one of Ms. Bissey's clients at her hair salon in Indiana.

[19]   Prior to her release, Ms. Bissey served two (2) days of incarceration.

same four offenses charged in the earlier complaint: (i) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (ii) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (iii) Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (iv) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). *See* ECF No. 6. (The government charged Ms. Morgan-Lloyd in a separate information. *See United States v. Anna Morgan-Lloyd*, Crim. No. 21-cr-00164 (RCL), ECF No. 5.)

On July 19, 2021, this Court reviewed and accepted Ms. Bissey's guilty plea to count four of the information. *See* ECF Nos. 20-22. At the sentencing hearing on October 12, 2021, pursuant to the parties' written plea agreement, they will jointly recommend a sentence of probation, 40 hours of community service, and restitution in the amount of $500 payable to the Department of Treasury. ECF No. 21 at 2.

## ARGUMENT

Ms. Bissey is a well-respected and productive member of her community with no substantive criminal history. She serves as the primary caretaker of her disabled husband and suffers from her own ailments, which make her especially vulnerable to suffering grave illness should she contract COVID-19 in an institutional setting. Her conduct on January 6, while admittedly unlawful, was neither aggressive nor malicious. A probationary term is sufficient, but not greater than necessary, to satisfy the purposes of sentencing. It would also stave off an unwarranted sentencing disparity between Ms. Bissey and her previous co-defendant, Ms. Morgan-Lloyd, who also received a probationary term. Finally, Ms. Bissey submits that the government, in its joint request for a probationary disposition, agrees that incarceration would be a "greater than necessary" punishment to reflect the seriousness of her offense, promote respect

for the law, provide just punishment, afford adequate deterrence, and ensure that Ms. Bissey not commit future crimes. Ms. Bissey joins the government in that sentiment.

    I.    **<u>Nature and Circumstances of Ms. Bissey's Conduct on January 6</u>**

Ms. Bissey did not set out from her small town in Indiana with an intent to subvert democracy. Instead, Ms. Bissey came to Washington, D.C. upon the urging of the President, eager to support him and be with like-minded individuals who believed the 2020 election had been corrupted. Though this belief has since been debunked, Ms. Bissey was convinced on January 6 that the claims of election meddling were true. When Ms. Bissey came upon the Ellipse on January 6, she planned to show her displeasure at the election results and hear the President speak to his supporters. It was not until President Trump's son raised the idea of marching to the U.S. Capitol that Ms. Bissey even considered going to the seat of Congress. Candidly, Ms. Bissey did not even know where the U.S. Capitol was in relation to the Ellipse. However, as President Trump wrapped up his inciting calls to action, Ms. Bissey and her friend joined the growing crowd moving down Pennsylvania Avenue.

By the time Ms. Bissey arrived at the U.S. Capitol around 2:00 p.m., many of the barriers that had been erected along the perimeter of the building were no longer present. Ms. Bissey and her friend met no resistance in their continuous march toward and inside the Capitol. At the time, Ms. Bissey did not see any Capitol police officers present, though she later learned that the officers had retreated inside upon being overwhelmed by the first wave of protestors.

When the doors to the Senate were breached around 2:45 p.m., Ms. Bissey, Ms. Morgan-Lloyd, and a woman who identified herself as "Linda" made the unfortunate and regretful decision to go inside. Upon entry, they were immediately subsumed into the large crowd of protestors who had gathered inside. They made their way to a nearby hallway to carve out some

space and took a picture of themselves with an unidentified person waving a Trump flag. Afterward, they lingered in the hallway for a short time. Then, approximately 10 minutes after she entered the Capitol, Ms. Bissey voluntarily left.

To be clear, Ms. Bissey played no role in organizing the rally on January 6, nor did she deliver inciting and aggressive commentary to the already energized crowd. She urged no one to "kick[] ass," "go after [politicians]", "punch back from Donald Trump" or engage in "trial by combat."[20] Additionally, Ms. Bissey did not participate in the forceful breaching of the outer barricades, nor did she participate in the breaching of the inner doors or windows of the U.S. Capitol. She did not damage or steal any property while inside, and she was not involved in the wider clashes between the protestors and police.

Demonstrating her lack of understanding of what occurred that historic day, Ms. Bissey boasted of her presence at the January 6 protest. She posted on social media that she was proud of having participated. She even bragged, albeit untruthfully, that she was one of the first individuals in the U.S. Capitol. However, over time, images of that day's violence challenged her recollections. She became overwhelmed by video footage showing protestors beating police officers, spraying gas in their faces, screaming obscenities, and destroying property. Eventually, Ms. Bissey realized that the events of January 6 were far more nefarious than what she,

---

[20]   *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

Notably, the Department of Justice has declined to bring criminal charges against the speakers or organizers of the rally; the only legal actions initiated against them being civil in nature. *See Thompson et. al., v. Trump et. al.*, 21-cv-00400, ECF No. 1 (Feb. 16, 2021); *Swalwell v. Trump et. al.*, 21-cv-00586, ECF No. 1 (Mar. 5, 2021); *Smith et. al. v. Trump et. al.*, 21-cv-02265, ECF No. 1 (Aug. 26, 2021).

personally, experienced and witnessed. She was left with deep regret, fear, shame, and remorse.[21] When Ms. Bissey was arrested nearly two months later, she cooperated fully with law enforcement, feeling relieved by the opportunity to take responsibility for her actions. She immediately waived her *Miranda* rights, spoke to investigators, and consented to the search and seizure of her cell phone. She admitted, without equivocation, that she entered the U.S. Capitol on January 6, tearfully explaining that had she known what was happening elsewhere that day, she never would have joined.

Simply put, Ms. Bissey entered the U.S. Capitol on January 6 to protest the results of the 2020 presidential election. She did not organize the preceding rally, nor the movement of people from the Ellipse to the U.S. Capitol. She did not break through barricades, windows, or doors to make her entry. She did not carry weapons, protective gear, or radios. She did not personally witness the violent clashes between other protestors and police and, in fact, was horrified to learn of the violent acts committed that day. Caught up in the moment, Ms. Bissey entered the historic building with her friend, took pictures, and left ten minutes later. Though certainly unlawful, the nature and circumstances of Ms. Bissey's actions on January 6 warrant a probationary disposition.

## II. History and Characteristics of Ms. Bissey

Ms. Bissey was born in 1968 and was raised by her adoptive parents, John and Mabel, in Bloomfield, Indiana. Purportedly, Ms. Bissey was the product of her 15-year-old mother's affair with a married man, making it exceedingly lucky that John and Mabel, distant relatives of her birth mother, adopted her. Notwithstanding the fact that John and Mabel had already raised four children, they welcomed three-month-old Ms. Bissey into their lives and hearts.

---

[21] *See* Ex. A: Dona Sue Bissey's Letter to the Court.

John worked at Indiana University as a cook, and Mabel, a cook herself, worked the overnight shift at a local truck stop. Ms. Bissey remembered being sheltered and showered with love by the pair. Growing up, she worked hard in school and earned average grades. Always sociable, Ms. Bissey participated in band and played tennis, volleyball, and softball. When she graduated high school, she took advantage of her father's ties to Indiana University and studied to be a nurse. However, after a bad run with the required chemistry courses, Ms. Bissey left college to pursue work as a cook.

In 1990, Ms. Bissey married her first husband, Mark Westlake. For a short time, the pair was happy, but after Mr. Westlake began physically abusing her, Ms. Bissey divorced him in 1992. In 1996, Ms. Bissey's beloved father, John, died. Wishing to be helpful to her grief-stricken mother, she temporarily moved in with her. In 2000, after earning her cosmetology license, she again left home. In 2007, Ms. Bissey met and married her current husband, Mr. Bissey, when he stopped into her salon for a haircut. After fourteen years of marriage, the pair remain in love and devoted to one another.

However, in 2014, Ms. Bissey and her husband were involved in a traumatic motorcycle accident. The pair were riding South down a two-lane highway in Indiana when an inexperienced teen driver attempted to pull into the north-bound lane in front of them. At the last minute, the teenager spotted an oncoming car in the north lane and halted his vehicle, causing Mr. Bissey, who was driving the motorcycle, to slam into the car. Upon impact, Mr. Bissey became pinned between the motorcycle and the car. Ms. Bissey was thrown from the back of the motorcycle over the top of the car. Afterwards, she recalled being catapulted into the air and trying to land in a way that minimized damage to her head and spine, tucking herself into a ball and landing in the middle of the highway. When she picked herself up, she could hear her

husband screaming.  Mr. Bissey was flown by helicopter to an Indianapolis hospital for treatment.

The accident shattered Mr. Bissey's pelvis, requiring him to undergo complete pelvis reconstruction.  He was in and out of a wheelchair for a year and a half.  Today, he is permanently disabled and suffers chronic pain. The accident also permanently damaged Ms. Bissey's left leg, which broke her fall after she was thrown from the motorcycle. (In the seconds before she was thrown, a foot peg broke off the motorcycle and embedded itself into Ms. Bissey's left ankle.)  Compounding her pain and slowing her recovery, Ms. Bissey also suffered from cirrhosis of the liver caused by autoimmune hepatitis.  To treat her condition, Ms. Bissey had been on steroids for over a year, which left her unable to tolerate pain medication and left her skin too fragile to withstand sutures.  As a result, she had to allow her wounds to close in the "open air," a process that took five months.  To this day, she experiences chronic leg pain from the nerve damage and scar tissue.

The accident also caused significant damaged to the Bisseys' financial well-being.  With Mr. Bissey unable to work, Ms. Bissey became the breadwinner.  She started her own hair salon and, owing to her gregarious and warm nature, had accumulated a steady stream of customers.  However, as happened with many small business, the COVID-19 pandemic hit her salon hard as customers sheltered at home.  To cope with the idle time and to distract herself from financial worries, Ms. Bissey found comfort in a steady diet of cable news and Facebook-scrolling.  The combination of messages plastered on cable TV and on social media inspired Ms. Bissey to heed the President's call to come to Washington, D.C. on January 6.

But Ms. Bissey does not define herself by her political beliefs or by her misinformed actions on a single day.  She views herself as a devoted wife to Mr. Bissey and a devoted step-

mother to Mr. Bissey's son, Cody. She is also a devoted aunt to Katrina, a confidante to her many clients, and the sole provider in her household.[22] And, with the birth of Cody's first child less than two weeks ago, Ms. Bissey is delighted to call herself a proud grandmother to baby Lily. Thus, while Ms. Bissey feels shame for her conduct on January 6, she hopes this Court will see it as an anomaly in light of her lawful and productive behavior over the preceding 53-year period.[23]

### III. Incarcerating Ms. Bissey Would be a Greater than Necessary Punishment

The Court should take care to ensure that an imposed sentence is not greater than necessary to achieve the purposes of sentencing under 18 U.S.C. § 3553(a). In Ms. Bissey's case, a sentence of 18 months of probation is appropriate. An 18-month term would recognize her husband's dependence on her, acknowledge the collateral consequences she already has faced because of her conduct, ensure she does not suffer from an unwarranted sentencing disparity, and allow her to avoid being confined in an institution during a pandemic while she suffers from a compromised immune system.

#### a. Ms. Bissey's Ailments Leave Her Uniquely Vulnerable to COVID-19, Making Incarceration an Especially Cruel Punishment

Tragically, the COVID-19 pandemic is far from over in the United States. Local governments, businesses, and schools, fearful about vaccine efficacy in the wake of new, frightening mutations, are attempting to keep Americans safe, especially those unable to get vaccinated or those who are especially vulnerable to complications from the deadly virus. Ms. Bissey, with her immunocompromised status and stressed liver functions from autoimmune

---

[22] *See* Ex. B: Character Letters in Support of Dona Sue Bissey.

[23] Ms. Bissey's only prior offense is a 30-year-old conviction for driving while impaired.

hepatitis-induced cirrhosis of the liver, is especially vulnerable to severe illness from the virus, and is therefore especially deserving of a sentence that does not require incarceration.

As noted above, Ms. Bissey was diagnosed with autoimmune hepatitis in 2012. Autoimmune hepatitis is a disease where the "body's infection-fighting system (immune system) attacks [] liver cells."[24]  It is a chronic condition that once developed, may cause inflammation and damage to the liver.[25]  In severe cases, the disease can scar the liver, causing cirrhosis.[26] Unfortunately for Ms. Bissey, by the time she was diagnosed with the autoimmune disorder, her liver had already been scarred.  To stop further scarring, her doctors proscribed a regiment of medications, including steroids and Azathioprine, a medication that suppresses the immune system.  She will remain on that immunosuppressant for life, meaning that her immune system will be consistently suppressed from fighting infections, as well as her own liver.

Because of Ms. Bissey's immunocompromised status, and because her liver is already damaged and scarred, COVID-19 presents a unique threat.  According to the Centers for Disease Control (CDC), those with chronic liver disease, and "especially cirrhosis, or scarring of the liver," are "more likely to get severely ill from COVID-19."[27]  Further, those that are

---

[24]  *See* John Hopkins Medicine, *Autoimmune Hepatitis*, available at https://www.hopkinsmedicine.org/health/conditions-and-diseases/hepatitis/autoimmune-hepatitis (accessed Sept. 30, 2021).

[25]  *Id*.

[26]  *Id*.

[27]  *See* Centers for Disease Control, People with Certain Medical Conditions, *Liver Disease*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (accessed Sept. 30, 2021).

immunocompromised,[28] "are especially vulnerable to COVID-19 because they are more at risk of serious, prolonged illness."[29] According to the CDC, "immunocompromised people don't always build the same level of immunity after vaccination the way non-immunocompromised people do," and some studies suggest that even "fully vaccinated immunocompromised people have accounted for a large proportion of hospitalized 'breakthrough cases,'" and that "immunocompromised people are more likely to transmit the virus to household contacts," than others with a fully-functioning immune system.[30]

Adding kindling to the fire, jails and prisons remain hotbeds for COVID-19 transmission, due to the condensed living spaces, density of population, and poor ventilation systems. In fact, in July of this year, the White House released a report recommending that correctional facilities divert individuals from confinement to help stop the disease's rapid spread.[31] Additionally, many jails and prisons are experiencing pandemic-protocol fatigue, lifting safety restrictions even though ravenous mutations of the virus continue to appear and spread at an alarming rate. This includes the D.C. Jail, where, as of September 13, 2021, it restarted full-contact attorney

---

[28] As stated above, Ms. Bissey is prescribed a life-saving medication, azathioprine, to suppress her immune system and guard her liver from further attacks.

[29] *See* Centers for Disease Control, People with Certain Medical Conditions, *Immunocompromised state (weakened immune system)*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (accessed Sept. 30, 2021).

[30] *See* Centers for Disease Control, *COVID-19 Vaccines for Moderately to Severely Immunocompromised People*, available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/immuno.html (accessed Sept. 30, 2021).

[31] *See Detection & Mitigation of COVID-19 in Confinement Facilities Guidance*, available at: https://www.cdc.gov/ncezid/dpei/pdf/guidance-detection-mitigation-covid-in-confinement-facilities-508.pdf.

and social visits and left few options for remote communication and court appearances. Either by a determination that the safety protocols are no longer needed, despite reams of evidence to the contrary, or a determination that due to staffing shortages, it is no longer able to maintain the protocols, the restrictions that kept D.C. inmates safe were summarily relaxed. The effects on inmates' infections rates were immediate with the D.C. Jail recording an uptick in positive and suspected cases of COVID-19.[32] Ms. Bissey, with her unique medical conditions, should be kept far away from these infection incubators.

Simply put, if Ms. Bissey is incarcerated at the D.C. Jail or in the BOP, which has seen 259 inmate deaths and over 43,000 infections from COVID-19, she is extremely likely to suffer severe illness or even death. According to the CDC, if she were to get sick with the virus, she may require "hospitalization, intensive care, a ventilator to help [her] breathe, or [she] may even die."[33] Certainly, Ms. Bissey has not helped her chances of fighting the virus by remaining unvaccinated.[34] But just as certainly, she does not deserve to die for her bad behavior on January 6. The Court should take her unique medical vulnerabilities into account when determining its

---

[32] The day after D.C. DOC's new policy, 20 inmates tested positive for COVID-19. Two days later, on September 16, 2021, 24 inmates tested positive. On September 21, 2021, 26 inmates tested positive. Additionally, on September 17, 2021, five (5) housing units were placed on quarantine due to exposure to the virus. On September 30, 2021, the Federal Public Defender was advised that seven (7) units at the jail were on quarantine status.

[33] *See* Centers for Disease Control, *COVID-19 Information for Specific Groups of People*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (accessed Sept. 30, 2021).

[34] Ms. Bissey maintains that she is unvaccinated because her doctor in Indiana has not advised her to get vaccinated and she is concerned about what the vaccine may do to her compromised liver. *See* Olga Khazan, *When 'Talk to Your Doctor' Goes So, So Wrong*, The Atlantic (Sept. 10, 2021), available at https://www.theatlantic.com/politics/archive/2021/09/doctors-tell-patients-not-vaccinated-covid-19/620024/.

sentence, and along with a host of other 18 U.S.C. § 3553(a) factors, determine that incarceration with all its ramifications during a deadly pandemic, is a sentence that would be greater than necessary to serve the purposes of sentencing.

    b. *Ms. Bissey's Husband is Completely Dependent on Her for Care.*

Following Mr. Bissey's motorcycle accident, he is completely disabled and unable to work. He has a limp, suffers from chronic pain, and experiences days that he simply cannot get out of bed. Ms. Bissey dutifully cares for him, the household, and the couple's finances. It is her income that pays for the mortgage, groceries, and utilities. If she were incarcerated and unable to work, the pair would not survive financially. As a result, Mr. Bissey—who did not participate in the protests on January 6—would lose his daily caretaker, and potentially, his home.

Making Ms. Bissey's presence even more indispensable, in late August 2021, Mr. Bissey suffered a series of mini-strokes. Ms. Bissey rushed him to the hospital; but, due to over-capacitation because of COVID-19, he could not be admitted. He and Ms. Bissey were forced to return home and seek the help of a neurologist on an out-patient basis. Because of this, the cause of Mr. Bissey's mini-strokes, as well as any therapy or medication to prevent further ones, has not yet been determined. In the wake of this additional medical scare, Mr. Bissey needs his wife to care for him at home more than ever.

    c. *Ms. Bissey Suffered Public Humiliation and Economic Loss as a Result of Her Actions on January 6*

A sentence of probation with community service and restitution is both just and fair considering the collateral consequences Ms. Bissey has faced because of her participation in January 6. Since her arrest in February, Ms. Bissey has been chastised on the street and her business shunned. She had to move her salon following huge losses from a drop in clientele and because the pandemic made rental space unaffordable. Though Ms. Bissey is normally a

gregarious and warm figure in her community, she has sunk into a state of despair inside her home. She lives in fear, knowing that every trip to the grocery store could result in someone angrily hurling insults or threats at her. Members of her family have been rebuked. Hate mail is regularly sent to her home address.[35] To assist with her heightened anxiety, Ms. Bissey began taking an antidepressant; despite the medication, she is often tearful during the day and has difficulty sleeping at night.

### IV. Sentencing Ms. Bissey to Incarceration Would Create an Unwarranted Sentencing Disparity

If this Court were to impose a sentence greater than a probationary term, community service, and restitution, it would create an unwarranted sentencing disparity. This is because Anna Morgan-Lloyd, the friend who accompanied Ms. Bissey to D.C. and engaged in the exact same conduct on January 6, 2021, was not given a carceral sentence. *See United States v. Anna Morgan-Lloyd*, 21-cr-00164 (RCL), ECF No. 29 (Jun. 28, 2021) (sentenced to probation). Additionally, other January 6 defendants convicted of the same misdemeanor offense to which Ms. Bissey pleaded guilty, were given similar non-incarceration sentences. *See United States v. Danielle Doyle*, 21-cr-00324 (TNM), ECF No. ___ (Oct. 1, 2021) (sentenced to probation); *United States v. Valerie Ehrke*, 21-cr-00097 (PLF), ECF No. 26 (Sept. 17, 2021) (sentenced to probation); *United States v. Jessica Bustle* and *Joshua Bustle*, 21-cr-00238 (TFH), ECF Nos. 42 & 44 (sentenced to supervised release with home confinement). There is nothing materially different about Ms. Bissey or her conduct that would justify such disparate treatment.

The courts have sentenced some January 6 misdemeanor cases to incarceration, but the nature and circumstances of those offenses, as well as the history and characteristics of the

---

[35] *See* Ex. C: Example of Hate Mail Received by Dona Bissey at Her Home Address.

defendants were vastly different than Ms. Bissey.  In *United States v. Derek Jancart and Erik Rau*, 21-cr-00467, the Honorable Boasburg sentenced both defendants to 45 days of incarceration.  However, in that case, unlike Ms. Bissey's, the prosecutors asked for four (4) months of incarceration for each defendant, citing that the men came to D.C. with gloves, a gas mask, and two-way radios.  *Id*.  Additionally, Mr. Jancart posted a video on Facebook during January 6, where he is heard laughing at police while Mr. Rau screamed, "We have you surrounded!"  Additionally, Mr. Rau, unlike Ms. Bissey, was on probation at the time of his offense on January 6 for domestic violence.

Additionally, this Court recently sentenced another January 6 defendant to 45 days of incarceration in *United States v. Matthew Mazzocco*, 21-cr-00054 (TSC), ECF No. __ (October 4, 2021).  However, Mr. Mazzocco blamed the violence that day on Antifa, deleted his social media accounts in an effort to obscure his actions, and refused to give law enforcement access to the body-worn camera he wore that day, claiming that he did not know where it was.  Ms. Bissey was far more cooperative with law enforcement, did not attempt to hide any evidence against her, and has not publicly blamed another group for the violence that day.  Additionally, the government in Ms. Bissey's case, unlike in Mr. Mazzocco's, is jointly requesting a sentence of probation.

All told, the facts of the offense conduct and characteristics of the defendants who garnered incarceration were starkly different than Ms. Bissey's conduct and characteristics.  As suggested by the government in its sentencing memorandum, Ms. Bissey's actions fall on the low-end of the spectrum that day and encompass "those who trespassed, but did not engage in aggravating factors, [] merit[ing] the imposition of a significant term of probation along with

restrictive mandatory and discretionary conditions", but not active incarceration.  *See* ECF No. 26 at 9, 10.

## Conclusion

January 6, 2021 was a horrifying day for many who watched it unfold, whether on television or in-person.  But Ms. Bissey, despite her presence within the crowd, was not a malicious actor who engaged in the outrageous conduct for which the day will be remembered.  She did not organize or incite the riot, nor did she physically harm any person or property.  And though Ms. Bissey certainly deserves punishment for her conduct, it must be weighed against her lack of criminal history, her immunocompromised status, her status as the primary caretaker of her disabled husband, the collateral consequences she already has suffered, and the non-incarceration sentences imposed on those who engaged in similar conduct.  Considering these and other § 3553(a) sentencing factors, an 18-month probationary sentence, restitution in the amount of $500, and 40 hours of community service is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
CARA HALVERSON
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Cara_halverson@fd.org