```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


  UNITED STATES OF AMERICA,      .
                                 .
            Plaintiff,           .  CR No. 21-0165 (TSC)
                                 .
      v.                         .
                                 .
  DONA SUE BISSEY,               .  Washington, D.C.
                                 .  Tuesday, October 12, 2021
            Defendant.           .  2:07 p.m.
  . . . . . . . . . . . . . . . .
```

```
                    TRANSCRIPT OF SENTENCING
            BEFORE THE HONORABLE TANYA S. CHUTKAN
                 UNITED STATES DISTRICT JUDGE
```

<u>APPEARANCES</u>:

For the Government:            JOSHUA S. ROTHSTEIN, AUSA
                              U.S. Attorney's Office
                              555 Fourth Street NW
                              Washington, DC 20530
                              (202) 252-7566


For the Defendant:            CARA K. HALVERSON, AFPD
                              Federal Public Defender Office
                              625 Indiana Avenue NW
                              Suite 550
                              Washington, DC 20004
                              (202) 208-7500


Court Reporter:               BRYAN A. WAYNE, RPR, CRR
                              U.S. Courthouse, Room 4704-A
                              333 Constitution Avenue NW
                              Washington, DC 20001
                              (202) 354-3186




Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S

 2                  (Via Videoconference)

 3           THE DEPUTY CLERK:  Your Honor, we have Criminal

 4   Action 21-165, United States of America versus Dona Bissey.

 5   We have Mr. Joshua Rothstein representing the government,

 6   Ms. Cara Halverson representing the defendant, all appearing

 7   by video, and we also have Ms. Kelli Willett representing

 8   Probation, and she's appearing by video as well.

 9           THE COURT:  Good afternoon.  We're here for the

10   sentencing of Ms. Bissey.  Ms. Bissey, can you hear me?

11           THE DEFENDANT:  Yes, Your Honor.

12           THE COURT:  Obviously, it's very important that you

13   be able to hear and you're on camera and see everything that's

14   going on.  If at any point you lose video or audio feed, you

15   need to let Mr. Bradley or somebody know so we can halt the

16   proceedings until we can reconnect you.  Okay?

17           THE DEFENDANT:  Yes, Your Honor.

18           THE COURT:  Ms. Halverson and Mr. Rothstein, do

19   the parties agree to proceed by videoconference pursuant to

20   the CARES Act given the current global pandemic?

21           MR. ROTHSTEIN:  Yes, Your Honor.  Thank you.

22           MS. HALVERSON:  Yes, Your Honor.  Thank you.

23           THE COURT:  All right.  And just in the event there

24   are parties -- good afternoon, Ms. Willett.  Just in the event

25   there are parties calling in or listening in or in any way
```

participating in these proceedings, just a reminder that it
is a violation of local and federal court rules to record any
portions of this proceeding or take any screenshots or any
video recording of these proceedings.

Okay.  We are here for the sentencing of Ms. Bissey,
who has pleaded guilty to Parading, Demonstrating, or Picketing
in a Capitol Building, in violation of Title 40 § 5104(e)(2)(G)
of the United States Code.

In preparation for this sentencing, I have received and
reviewed the following materials: The presentence report and
sentencing recommendation from the probation department and
the following documents submitted by counsel in advance of the
hearing.

I've looked at the plea agreement signed by Ms. Bissey,
the statement of offense signed by Ms. Bissey, the government's
sentencing memorandum, Ms. Bissey's sentencing memorandum,
Ms. Bissey's letter to the Court, and letters of support for
Ms. Bissey from her husband, from Katrina Michael, Kimberly
Gooding, Deanna Patterson, Melinda Barnhill, Sondra Thompson,
and I've reviewed the presentence investigation report and
recommendation.  Okay.

Am I missing anything, Ms. Halverson or Mr. Rothstein?

MR. ROTHSTEIN:  No, Your Honor.

MS. HALVERSON:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Let me start with the presentence

1   report.  The final presentence report and sentencing

2   recommendation were filed on September 23, 2021.  I understand

3   that both parties were able to look at the draft before I saw

4   it and make any objections, but I'll ask on the record now,

5   Mr. Rothstein, does the government have any objection to any of

6   the factual determinations set forth in the presentence report?

7              MR. ROTHSTEIN:  No, Your Honor.  Thank you.

8              THE COURT:  Ms. Halverson?

9              MS. HALVERSON:  No, Your Honor.

10             THE COURT:  Okay.  Are either of you expecting any

11   witnesses at this hearing?

12             MR. ROTHSTEIN:  No, Your Honor.

13             MS. HALVERSON:  Not from the defense.  No.

14             THE COURT:  All right.  Ms. Bissey, are you fully

15   satisfied with the services of Ms. Halverson as your attorney

16   in this case?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  Okay.  Do you feel that you've had enough

19   time to talk to her about the presentence report prepared by the

20   probation department and the papers that were filed by the

21   government in connection with your sentencing?

22             THE DEFENDANT:  Yes, Your Honor.

23             THE COURT:  Okay.  Ms. Halverson, have you and

24   Ms. Bissey read and discussed the presentence report?

25             MS. HALVERSON:  We have, Your Honor.

1          THE COURT:  And you've already stated that there are

2     no disputed issues of fact; that is, Ms. Bissey has no objection

3     to any of the factual statements set forth in the presentence

4     report?

5          MS. HALVERSON:  Correct.

6          THE COURT:  Okay.  Hearing no objection from either

7     side, I will accept the factual recitations in the presentence

8     report regarding the circumstances of the offense, and therefore

9     the facts as stated in the report will be my findings of fact

10    for the purpose of this sentencing.

11        Now, Ms. Bissey, because you have pleaded guilty to a

12    misdemeanor offense, the United States Sentencing Guidelines

13    do not apply to your case, but nonetheless, the statute titled

14    18 U.S.C. § 3553(a) requires me to consider a variety of factors

15    including the applicable penal statutes to your case.

16        The charge of Parading, Demonstrating, or Picketing in

17    a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G),

18    carries a statutory maximum penalty of six months of imprisonment.

19    Because you have pleaded guilty to a petty offense, the statutes

20    do not authorize a term of supervised release, and the statute

21    of conviction sets a maximum fine of up to $5,000.

22        A special assessment of $10 is mandatory, and the statutory

23    restitution provisions are applicable because there is an

24    identified victim.  Under 18 U.S.C. § 3663A and the plea

25    agreement, you have agreed to pay $500 in restitution to the

1    Clerk of the Court for disbursement to the Architect of the

2    Capitol to compensate for damages that were done to the Capitol

3    during the January 6th riots.

4         Counsel, have I stated accurately the statutory framework

5    here?  Mr. Rothstein?

6              MR. ROTHSTEIN:  Yes, Your Honor.

7              THE COURT:  Ms. Halverson?

8              MS. HALVERSON:  Yes, Your Honor.

9              THE COURT:  Okay.  You all may have already received

10   this information, but before I discuss the statutory sentencing

11   factors -- well, let me ask you, Ms. Halverson, have you

12   received the probation office's sentencing recommendation?

13             MS. HALVERSON:  I have, Your Honor.  Thank you.

14             THE COURT:  Mr. Rothstein, have you?

15             MR. ROTHSTEIN:  I have not seen that, Your Honor.

16             THE COURT:  Okay.  Well, the probation office has --

17   taking into account the available sentences and all the factors

18   under § 3553(a), the probation office recommends a sentence

19   of 18 months of probation, $500 in restitution, and a special

20   assessment of $10.  The recommendation of the probation office

21   is not based on any facts and circumstances that have not

22   already been revealed to the parties in the presentence report.

23        And, Ms. Bissey, as I told you at your plea hearing, the

24   Court is bound only by the statutory maximum of six months in

25   prison here.  The probation office has made its recommendation,

1   the government has made its request for what it believes to be

2   a just sentence, and so has your lawyer.  I am not bound by any

3   of these; I am bound only by the statutory maximum.  Of course

4   I will consider all the recommendations in this case, but in

5   the end, the decision as to what your sentence will be is mine.

6   Do you understand?

7           THE DEFENDANT:  Yes, Your Honor, I do.

8           THE COURT:  Okay.  Now, at this point I'd like

9   to give the parties an opportunity to address the Court.

10      Mr. Rothstein.

11      MR. ROTHSTEIN:  Thank you, Your Honor.

12      Actions have consequences.  Rioting to overturn an election

13  has consequences.  If you don't want to suffer an economic loss

14  to your business, don't join a riotous mob and then write on

15  social media that "It's the best f'ing day ever."

16      If you don't want to suffer public humiliation, don't

17  storm the Capitol and then write on social media, "I'll never

18  forget it for the rest of my life.  I'm glad I was there."

19      And if you don't want to be shunned by your community,

20  don't try to tear down your government and then write on social

21  media, "I'm glad I was a part of it.  No shame."

22      So let's focus on the defendant's actions which bring

23  her before the Court today.  The defendant and her friend,

24  Anna Morgan-Lloyd, came from Indiana to participate in the

25  January 6th attack on the Capitol, a violent attack that forced

an interruption of the certification of the 2021 electoral vote count, threatened the peaceful transfer of power, injured more than 100 members of law enforcement, and resulted in more than a million dollars worth of property damage.

After attending the Stop the Steal rally, the defendant and Morgan-Lloyd proceeded to the Capitol.  On the way to the Capitol, the defendant took two photographs which she posted on Facebook.  Both included rioters in full battle-dress uniform -- helmets, gloves, camouflage -- and she wrote "They're here" with a smiley face.

After arriving at the Capitol and ascending the steps, the defendant took photos of the riotous mob including those in or around the scaffolding on the western front of the building. The defendant then entered the Capitol building through a door on the western front approximately one minute after it had been breached by rioters that broke windows and pushed back a number of law enforcement officers who had attempted to barricade the entry and had fallen back to defend themselves.

The defendant walked through a single hallway and remained in the Capitol for a little over 10 minutes.  While inside the building, the defendant posted a photograph with Morgan-Lloyd and two other individuals in a hallway of the Capitol, one of whom is holding a Trump campaign flag.  The defendant later posted that photograph on Facebook with caption "Inside the Capitol Building."

Later that day, the defendant posted on Facebook, bragging that "This is the first time the U.S. Capitol has been breached since it was attacked by the British in 1814."  It's mind-boggling why the defendant was proud to have accomplished something that had only previously been done by a foreign enemy at war with our country.

In the same post, the defendant described a fellow rioter as a, quote, "True Patriot and Warrior!!!"  The individual the defendant described as a true patriot and warrior and her fellow members of the mob were in fact rioters, breaking windows, destroying government property, and assaulting law enforcement officers.

The patriots and warriors were the members of law enforcement who were outnumbered and fought back against thousands of protesters, to protect the Capitol and its public servants running for their safety.  It should be noted that all of the photographs that were posted by the defendant and Anna Morgan-Lloyd were taken by the defendant.  Her phone appears to be the only source of their photos that were later posted on social media.

That evening, in a text message to a friend, when asked if she was scared, the defendant said, "Hell no.  We stormed the Capitol, and I'll never forget it for the rest of my life.  I'm very glad I was there.  God has kept us safe."

The next day, the defendant posted on Facebook and wrote,

"It was a day I'll remember forever.  I'm proud that I was a part of it!  No shame.  BTW" -- which stands for "by the way" -- "turn off the #FakeNews."

On January 8, the defendant posted two more photos including one with rioters climbing the scaffolding and one with a rioter holding a broken sign that had been ripped from the wall of the Speaker's office.  The defendant wrote, "This really happened!"

On January 11, five days after the riot, the defendant continued to be prideful about her unlawful conduct, posting another photo showing rioters walking down the steps of the Capitol.

On February 24, 2021, the defendant was arrested outside of Hot Heads Hair salon, which she owned and operated. The defendant agreed to be interviewed by law enforcement. Although she accepted responsibility for her actions, she claimed that she was, quote, shocked by what they saw on the news and did not have any idea of the activities in the Capitol.

Most unbelievable was that the defendant claimed that she would not have gone into the Capitol if she had known that she was not allowed.  It's not clear why the knocked-over barricades, teargas, broken windows, law enforcement in riot gear and general mayhem did not serve as a sufficient signal that perhaps the Capitol was not welcoming visitors

that day.  The defendant told the agents that God had told

her to go to the Capitol that day.

In July 2021, the defendant pleaded guilty to one count

of Parading, Demonstrating, or Picketing in a Capitol Building.

By way of background, early in this investigation the government

made a limited number of plea offers in misdemeanor cases that

included an agreement to recommend probation.

Here the defendant promptly accepted the government's

offer.  The government is, therefore, abiding by its prior

agreement to recommend probation.  Specifically, the government

recommends a sentence of three years' probation here.

There are a number of factors that the Court should

consider in fashioning a sentence.  First, the government

is not aware of any evidence that the defendant's entry into

the Capitol was preplanned or coordinated with anyone else,

including any extremist or organized groups.

Second, the government is not aware of any evidence that

the defendant incited others to commit other acts of violence

or destruction.

Third, the government is not aware of any evidence that

the defendant engaged in any violence towards law enforcement.

Fourth, the government is not aware of any evidence that

the defendant destroyed or stole any property from the Capitol.

Fifth, based on the government's investigation, it appears

that the defendant remained in a limited part of the Capitol

1   building for a limited period of time, i.e., one hallway for

2   a little over 10 minutes.

3       The government is not aware of any evidence that the

4   defendant entered any rooms or offices in the Capitol, the

5   Capitol Rotunda, or the Senate or House chamber.

6       Sixth, the defendant cooperated with law enforcement at

7   the time of her arrest including submitting to a voluntary

8   interview.

9       Seventh, the defendant timely admitted to her actions and

10  accepted responsibility.

11      And eighth, the defendant does not have a criminal history.

12      The government believes that these factors all support

13  the recommendation of a sentence of three years' probation,

14  restitution, and community service.  The government notes that

15  the defendant has already served two days in jail at the time

16  of her arrest.

17      In addition, the government's recommendation would result

18  in the defendant's conduct being under government supervision

19  for a period of three years.  As noted in the government's

20  sentencing memo, the defendant appears to be susceptible to

21  believing outlandish and absurd conspiracy theories.  To protect

22  the public, it's important to make sure that she does not fall

23  victim to another lie or conspiracy and act out in a way that

24  again jeopardizes public safety.

25      For instance, as we noted, she's a follower of QAnon and

appears to be an avid consumer of associated conspiracy theories
including, among other things, that the coronavirus does not
exist, specifically that it is a hoax "scamdemic," that the
vaccine is part of a plot by the Jewish Illuminati to murder
people, and that the pandemic was foreshadowed through, quote-
unquote, predictive programming during the opening ceremony
at the 2012 London Olympics.

Her susceptibility to believing these dangerous conspiracy
theories and, more importantly and most relevantly, her
willingness to act on it is an important reason why three
years of probation is necessary.  It's one thing to believe in
conspiracy theories in your basement, and it's another thing
to act out on them and, for instance, to travel from Indiana
to D.C. to storm the Capitol to overturn an election.

Had the government requested that the Court impose a term
of incarceration, the maximum term of government supervision
would have been six months.  Under the government's recommendation,
the defendant will be under government supervision for an
additional 30 months.

In addition, the government is requesting that the Court
impose the following mandatory conditions of probation:

(1) that the defendant not commit another federal, state,
or local crime during the term of probation;

(2) that she not unlawfully possess a controlled substance;

(3) that she refrain from the use of controlled substances

and submit to at least one drug test within 15 days of release on probation, and at least two periodic drug tests thereafter as determined by the Court for use of a controlled substance;

(4) that she make restitution and pay the special assessment;

(5) that she notify the Court of any material change in her economic circumstances that might affect her ability to pay restitution, fines, or special assessments.

In addition, the government is requesting that the following discretionary conditions be imposed by the Court:

(1) that the defendant refrain from possessing a firearm, destructive device, or other dangerous weapon;

(2) that she work in community service for 40 hours as directed by the Court;

(3) that she report to a probation officer as directed by the Court or Probation;

(4) that she permit a probation officer to visit her home or elsewhere as specified by the Court;

(5) that she answer inquiries by a probation officer and notify probation promptly of any changes in address or employment;

(6) that she notify a probation officer promptly if she's arrested or questioned by law enforcement; and

(7) that she satisfy such other conditions that the Court may impose.

The government believes that 36 months of these onerous

conditions, as well as the two days already spent incarcerated, will serve the goal of both specific and general deterrence.

Because of the defendant and her fellow rioters' actions, schoolchildren and tourists who come to the Capitol will visit not just the site where Congress makes laws and presidents deliver their State of the Union and American heros lie in state, they will now visit a crime scene.

When the defendant visited the Capitol that day, she was never a tourist or a peaceful protester.  She was a rioter, a member of an angry mob.  The defendant's storming of the Capitol is a serious violation of the law, and she must be held accountable.  Just as she said she will never forget that day, it is important that she also never forgets the punishment she receives and the consequences for her unlawful actions.

For the reasons set forth above and in the government's papers, the United States respectfully requests that the Court impose a term of three years' probation including the mandatory and discretionary conditions described above, restitution in the amount of $500, and 40 hours of community service.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Rothstein.

Ms. Halverson?

MS. HALVERSON:  Thank you, Your Honor.  So I just want to start with saying that I think we can all agree that January 6 was a day many of us will remember, because I think

it broke a lot of our hearts.  Many of us were angry, angry that a politician was allowed to run wild and angry that supporters of that politician claiming to be patriots did something so wildly unpatriotic.  The United States' seat of government was invaded.  It was horrifying to watch.  And as the images continued to spill out in the coming weeks, many of us were left aghast.

But even with those feelings, Your Honor, I implore the Court to focus its attention on Ms. Bissey as an individual and not as a proxy for that entire day, nor as a symbol of President Trump's supporters.  This cannot be about Ms. Bissey's beliefs. As strange or weird as they are, it cannot be about her beliefs. It must be about her actions that day.

Ms. Bissey is a new grandmother and a devoted wife to her husband Denny.  She is more than her actions on January 6. She is a 53-year-old woman that has spent her entire life in Indiana.  She has no interactions with the criminal justice system except for a 30-year-old, alcohol-related incident. She doesn't drink.  She doesn't gamble.  She doesn't smoke.

She takes care of her husband after the pair suffered a devastating motorcycle accident in 2014.  She deals with an autoimmune hepatitis disorder the best that she can.  She started and maintains her own business and is the powerhouse economic firestorm of her household.

She is gregarious.  She is warm.  She is lively.  I can

promise you that she is not a monster.  She is a woman who made a mistake, and that mistake has already cost her dearly, both emotionally and financially.

I wrote a longer history about Ms. Bissey and her life in my sentencing memorandum, but I think that there are four main facts that I want to highlight for Your Honor.

The first one is that she did not come to D.C. with any intention other than supporting her president.  She had no idea, no ambition, and no plan of storming the Capitol that day.  She did not break anything, assault anyone, or steal any property.  She was in the building for 10 minutes, took photos, and then left of her own volition.

Ms. Bissey's former codefendant, who did the exact same conduct as Ms. Bissey, lock in step, Ms. Anna Morgan-Lloyd, was sentenced to probation already.  It would be a grave and unwarranted sentencing disparity if this court were to sentence Ms. Bissey to something different than that.

Additionally, the prosecutor, the probation office, and defense are all uncommonly asking the Court not to impose executed incarceration in her case.

And the fourth point I want to make, Your Honor, is that she is sorry.  She is ashamed of her actions on January 6.  I have gotten to know Ms. Bissey over the life of this case, and I cannot tell you the amount of times she has called me, crying, about January 6.  She is genuinely remorseful about her

1    actions.  She is ashamed that she participated.

2        But I don't think -- and I lay this out in my sentencing

3    memorandum -- I don't that that hit her right away.  So I think

4    that there were some comments that she made and the prosecutor

5    pointed out that she made in the few days after January 6 which

6    show that, at the time, she was proud of her interaction.  But

7    over time, and as the images came out and more information was

8    revealed about what happened that day at all the different

9    fronts of the Capitol building, she became horrified that she

10   participated in something like that.

11       As she wrote in her letter to you, she does consider

12   herself to be a patriot, she does love her country, and she did

13   not mean to do something that would cause shame for her or for

14   her family or for her country.  She sincerely believes that what

15   she did was wrong, and I have no doubt that she will not repeat

16   something like this.

17       Finally, I'll just note to the Court an update that

18   happened this morning.  Mr. Bissey, who is Ms. Bissey's

19   husband, was admitted into the ER because he may have had

20   another ministroke episode, and he's being checked out right

21   now at the ER.

22       I told Ms. Bissey this morning, I said, if we need to seek

23   a continuance for sentencing, I would happily ask Your Honor

24   for that.  And she said, "No, no, no, no, no.  I just told them

25   not to call me from the ER.  I'll find out what happened to him

after.  It's important that I'm in court."  So that should show you a little bit of integrity for Ms. Bissey.

Additionally, her daughter-in-law, who just had her first grandchild, is also in the hospital with aortic tears of her heart, which means that the entire family is sort of in crisis mode trying to care for newborn baby Lily.  And Ms. Bissey, again, wanting to make sure that she was fully available, made arrangements for the other grandmother to be keeping care of Lily while she is participating in the sentencing today.

I say that because in my sentencing memo I talked about how Ms. Bissey was very much needed at home, and I think even more so than when I wrote that, she is needed at home now.

So, for all of these reasons and the reasons noted in my sentencing memorandum, for the reasons noted in the government's sentencing memorandum and probation's recommendation, I ask the Court to impose a sentence of probation, no active incarceration beyond the two days that she's already served, the community service, and the restitution order of $500.

THE COURT:  Thank you, Ms. Halverson.

And, Ms. Bissey, is there anything you'd like to say?  I've read your letter, but you're certainly free to address the Court at this point.

THE DEFENDANT:  No, Your Honor.

THE COURT:  All right.  And I am sorry to hear about your husband and daughter-in-law, and I hope they both make a

speedy recovery.

THE DEFENDANT:  Thank you.

THE COURT:  All sentencings are difficult for this Court, and I think they're difficult for my colleagues generally, because we are tasked with a grave responsibility of exacting punishment, taking into account the factors that support sentencing and viewing each defendant that comes before us as an individual.

And, Ms. Halverson, I fully agree with you.  While Ms. Bissey participated in a mob action, her actions are different from others, her background is different from others, and I view her as an individual here and have taken into account all the material I've read and all the letters I've gotten on her behalf.

As with all sentencings, I must balance the factors that I have to consider in sentencing, bearing in mind that the sentence that I impose should be sufficient but not greater than necessary to comply with the purposes of sentencing.

These purposes include the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and provide for just punishment.  The sentence should also deter criminal conduct, protect the public from future crimes that the defendant might commit, and promote rehabilitation.

I must also consider the nature and circumstances of the

offense, the history and characteristics of the defendant, the
types of sentences available, the need to avoid unwarranted
sentence disparities, and the need to provide restitution.
I've considered all these factors, some of which have greater
relevance than others.

Ms. Bissey has already agreed, as part of her plea
agreement, to pay restitution.  Given her financial situation,
I see no reason to impose a fine where she's already stretched
thin in that regard.

The nature and circumstances of the offense are of
particular importance here.  I've said it, and so have my
colleagues:  Without the participation of every single person
who entered the Capitol unlawfully on January 6, there would
have been no mob, and that mob came dangerously close to
accomplishing its goal of preventing the lawful transfer of
power, something that has never happened in this nation's
history.

Ms. Bissey was no inadvertent participant.  She and her
friend, Ms. Lloyd, drove to Washington from Indiana to protest
the fact that their candidate had lost the election, which many
of her and her co-protesters believed was somehow stolen from
her.

Now, I want to make it clear, Ms. Halverson and
Mr. Rothstein -- Ms. Halverson has touched on it, but I want
to make it clear.  This court does not factor Ms. Bissey's

political beliefs into the sentence.  Ms. Bissey is free
to believe whatever she wants to believe and have whatever
political philosophy and support whatever candidates she does
and she believes.  That is the right of every person in America.
And it is a right that those people who work in the Capitol
were defending that day, and it is a right that I will defend.

This case is not about Ms. Bissey's political beliefs.
It is about her actions.  And that is what the sentence is
focused on.  Ms. Bissey attended the protest at the Ellipse
where several speakers encouraged the crowd to take action.
And take action she did.

At several points along the way, Ms. Bissey could have
chosen to disassociate herself from the mob.  At every point,
she chose not to.  She could have left the protest at the
Ellipse and returned to where she was staying.  She chose not
to.  She walked with the crowd to the Capitol where she saw
people pushing through the fencing at the bottom of the steps
and heard a window being broken.

Minutes after the Senate doors were breached, while
congressional employees were running or hiding in fear for their
lives, Ms. Bissey and her friend went inside.  Once inside, they
wandered around taking photographs, despite the chaos and the
violence going on around them.

When Ms. Bissey got home, she was not struck with remorse
or regret for what she'd done.  As Mr. Rothstein has set forth,

in the days after the riot, once Ms. Bissey had returned home,
she continued to post and brag of her participation:  "It is
a day I'll remember forever.  I'm proud I was a part of it.
No shame."

On the 8th she posted photos including one with a
protester holding a stolen, damaged sign reading "Speaker of
the House."  She posted a screenshot of a Twitter post that
read, "This is the first time the U.S. Capitol has been breached
since it was attacked by the British in 1814," bragging.
She was celebrating and bragging about her participation in
what amounted to an attempted overthrow of the government.

It was not until January 22, when she went to apply for
a firearm permit and someone recognized her from her pictures,
she was questioned by law enforcement and eventually charged.
And that is when the remorse sets in.

I understand your position, Ms. Halverson, but I
cannot help but think that had there been no consequences
for Ms. Bissey in terms of getting criminally charged, had
there been no public outcry, she would still be proud of her
participation in that riot.

It wasn't the public images that caused her to rethink
her participation.  It was the consequences to her, personally.
I've read in the submissions you gave me about the consequences
that she personally has suffered, from losing her lease, from
her business drying up, from the condemnation that she has

received from people in the community.  So I do question your characterization of her remorse, and it's not, in my opinion, borne out by the record.

Now, with regard to Ms. Bissey's history and characteristics, the Court has reviewed the presentence report and the defense submissions, including the letters in support of Ms. Bissey, and despite some minor charges many years ago, she appears to have lived a productive life and has many friends and family members who love and support her.  This is to her credit.

Also to her credit are the things that Mr. Rothstein mentioned.  During the riot, she did not break anything, she didn't destroy anything, she didn't steal anything, she didn't assault law enforcement, and she left of her own volition. These are factors in her favor, and I have considered them in determining my sentence.

As to the types of -- and I've said this before, and I'll say this in Ms. Bissey's case: People are complicated. I frequently have defendants in front of me who are loved in their community or who are loved by their families or who are loved by their children.  Good people are capable of doing bad things.  And Ms. Bissey appears to be a person who's loved by her family, who supports her family, and upon whom her family relies.  But she engaged in conduct that was, frankly, regrettable and dangerous.

Now, as to the sentences available, Ms. Bissey certainly

does not appear to be -- it occurs to me that Ms. Bissey does
not necessarily need three years' probation.  I agree with
Mr. Rothstein that she appears to be particularly susceptible
to false conspiracy theories and false information, but again,
it's Ms. Bissey's right to believe whatever she wants to believe.
That's her right.  She has that freedom of choice.

She told the presentence report writer that she is --
and I'm using the terms from the presentence report -- she's
an anti-masker and an anti-vaxxer.  That is her right.  She
absolutely has that right to believe that and an absolute
right not to vaccinate herself, take a vaccination.

But, Ms. Halverson, I have to say that I find it pretty
ironic that you urge -- and you recognize the irony -- that you
urge me not to incarcerate Ms. Bissey because she has health
conditions that could put her at serious risk of COVID when she
appears (a) not to believe in COVID, and (b) has refused to take
action which would prevent or at least help to alleviate or
minimize the danger posed by a COVID infection.  So I find that
somewhat puzzling and most certainly inconsistent.

MS. HALVERSON:  May I respond to that, Your Honor?

THE COURT:  Yes.

MS. HALVERSON:  So, first of all, I don't think
that -- I don't know if it was Twitter that Mr. Rothstein
quoted, but every time that I've talked to Ms. Bissey, she
has been very concerned about COVID.  So she is not somebody

1   that does not believe that COVID does not exist.

2          THE COURT:  Okay.

3          MS. HALVERSON:  In fact, when she took her husband to

4   the ER because of his ministrokes, she was on the phone with me

5   complaining about how there were people coming into the ER that

6   appeared to have COVID symptoms, that she was very worried about

7   and very angry that they didn't read the sign saying that they

8   should've come into a different entrance, and was very worried

9   that her husband, who was having ministrokes, was going to then

10   contract COVID.

11      It is true, and I laid that out in the sentencing

12   memorandum, that she has not been vaccinated.  But I tried

13   to allow the Court some explanation for that.  One of I think

14   the problems is that her doctor hasn't told her to get

15   vaccinated.  And that is a problem -- that is an ethical

16   responsibility, a problem of her doctor.  And Ms. Bissey --

17          THE COURT:  Well, I don't have any evidence before

18   me, Ms. Halverson, that her doctor does not recommend it.

19   I mean, what you're sort of telling me is there's an absence

20   of a positive, which is she says her doctor hasn't told her to.

21   She hasn't said her doctor hasn't told her not to.

22      And what I have a problem with -- again, Ms. Bissey's

23   vaccination status does not factor into her sentence.  I want

24   to make that absolutely clear.  But I cannot use her decision

25   to place herself at a heightened risk of infection as a reason

1    for giving her a lenient sentence.  That makes no sense.

2              MS. HALVERSON:  I think -- well -- I mean, obviously

3    you're the judge, so you can disagree with my reasoning, but

4    I think given the fact that there is a new report that just

5    came out from the *New York Times* today that says that people

6    that are vaccinated over the age of 50 are at even more risk

7    than unvaccinated children, I don't think that getting the

8    vaccination necessarily means that Ms. Bissey is free from

9    getting through a breakthrough infection.  I think I forwarded

10   some of the reports from the CDC about breakthrough infections

11   when there's immunocompromised individuals.

12             THE COURT:  Ms. Halverson, you are setting up a straw

13   man.  You are setting up a straw man.  All I have said is that

14   the science is clear and undisputed that getting a COVID vaccine

15   increases your ability to survive an infection, not that she

16   wouldn't get a breakthrough infection and not that she wouldn't

17   get sick, but that being vaccinated increases the likelihood

18   that you will not suffer serious injury or death that you would

19   if you were unvaccinated.

20        And all I'm saying is that Ms. Bissey seems to be asking

21   me to take into account her health status and her underlying

22   illnesses and susceptibility and the risk of her getting COVID,

23   yet she has not seen fit to help herself do something that would

24   help fight that risk or ameliorate that risk.  And her decision

25   not to get vaccinated is, again, absolutely her right and not a

factor I'm going to take into sentencing, but it cannot be

a reason why I give her a more lenient sentence.

MS. HALVERSON:  I think my point, Your Honor,

is that even if she had gotten vaccinated, I would still

be arguing that because of her immunocompromised status --

THE COURT:  Perhaps.

MS. HALVERSON:  -- that she shouldn't receive

jail time.

THE COURT:  All right.  The issue of sentencing

disparity is less of a factor here, because these offenses

are unique and there is not a large number of defendants

who have already been sentenced.

I take into account Ms. Halverson's point that Ms. Lloyd,

who did the same conduct, at least on the 6th, as Ms. Bissey,

received probation from a different judge in this court.

Mr. Rothstein noted that Ms. Lloyd did not continue to post

and brag about and gloat about her participation, at least on

social media, after the fact, and did not appear to have taken

any photographs.  But I have considered the need to avoid

sentence disparity as a factor, but it certainly is less of

a factor with this court than the seriousness of the offense

and the need to have deterrence.

The Court concludes that this is not an appropriate case

for a straight probationary sentence.  The Court has taken into

consideration Ms. Bissey's positive factors that I've discussed,

the fact that she is admired and loved and helps to support her
family.  But there must be consequences for taking part, even a
small part, in a mass attempt to stop the certification of
the presidential election and prevent the transfer of power.

Even though she didn't commit violence or destroy property,
Ms. Bissey walked into the Capitol that day knowing full well
that she was not supposed to do so.  She was fully aware of the
chaos and destruction going on around her, and she had to be
aware that her presence lent support to the mob.  And when she
went home, she bragged about being part of the riots.

I have heard a lot, in both writing and in court today, the
fact that Ms. Bissey has suffered repercussion from her action.
I haven't heard a single word about what the people inside that
Capitol were suffering that day, who were just doing their jobs,
doing their patriotic duty that day, or the law enforcement
officers who were outside, outnumbered, who were fighting with
their hands sometimes, to try to keep the Capitol safe.

I have heard Ms. Bissey describe herself and others
describe her as a patriot, and I don't doubt for a minute her
love of her country.  But the people inside that Capitol, trying
to do their jobs, they were patriots also.  And so were the
law enforcement officers.  And the Court must take into account
the seriousness of what Ms. Bissey did and the need to make
sure that neither she nor anyone else even thinks about doing
something like that again.

1        Therefore, having considered all the factors that I must

2   consider in this case, the Court believes a penalty of 14 days

3   of incarceration and $500 in restitution, followed by 60 hours

4   of community service, is an appropriate sentence in this case

5   and is sufficient but not greater than necessary to reflect

6   the seriousness of the instant offense, to promote deterrence,

7   to protect the public from future crimes that may be committed

8   by the defendant, and to avoid unwarranted disparities among

9   defendants convicted of similar crimes.

10       I listened to Mr. Rothstein describe the need for probation

11   in this case, and I understand it, but I think a lot of -- I

12   really think that Ms. Bissey -- I don't think probation is going

13   to keep Ms. Bissey from ever doing this again.  I think a

14   serious punishment of the incarceration I've given her will

15   bring home the fact that this is something she must never do

16   again.

17       And I think the fact that she subscribes to bizarre

18   conspiracy theories, that's her right, you know?  That's

19   something she's allowed to do as an American, and that's what

20   our democracy and our freedom is all about.  And I'm not going

21   to impose a probationary sentence on her in this case.

22       I think the probation office is just overworked and

23   overstretched with all the cases that we have backlogged because

24   of the pandemic and the additional over 600 cases that are

25   coming into this court from the Capitol riots, and I think it

1    would be a waste of resources, frankly, to have Ms. Bissey

2    under a further probationary sentence at this time.

3         Therefore, based on my consideration of all the

4    Section 3553(a) factors, I'll state the sentence to be imposed:

5         It is the judgment of the Court that you, Dona Sue Bissey,

6    are hereby sentenced to serve 14 days of incarceration, and you

7    must perform 60 hours of community service, pay a $10 special

8    assessment.  The Court finds that you do have the ability to pay

9    restitution and therefore imposes a special condition, as agreed

10   to in your plea agreement, requiring the payment of $500 in

11   restitution.

12        The special assessment is immediately payable to the

13   Clerk of the Court for the U.S. District Court of the District

14   of Columbia.  Within 30 days of any change of address, you shall

15   notify the Clerk of the Court of the change until such time as

16   the financial obligation is paid in full.

17        You must complete 60 hours of community service.  Community

18   service requirement will benefit not only the community but

19   also you as you acquire additional experience and broaden your

20   community of associates.  Once you have completed your 60 hours

21   of community service, you should provide that verification to

22   your lawyer, who will provide it to the Court, since you will

23   not be under the supervision of the probation office.

24        Pursuant to 18 U.S.C. § 3742, you have a right to appeal

25   the sentence imposed by this court subject to certain rights of

1    appeal you waived as part of your plea agreement in this case.

2    If you choose to appeal, you must file an appeal within 14 days

3    after the Court enters judgment.  If you are unable to afford

4    the cost of an appeal, you may request permission from the Court

5    to file an appeal without cost to you.

6        As set forth in the plea agreement, the government pledged

7    to move to dismiss the remaining counts in the indictment.

8    Mr. Rothstein, do you wish to do so now?  I mean in the

9    complaint.  Excuse me.

10            MR. ROTHSTEIN:  Yes, Your Honor.  The government asks

11   that the remaining counts of the information --

12            THE COURT:  Information.  All right.  That motion

13   will be granted.  I will allow Ms. Bissey to turn herself in

14   to serve her sentence, and that way she will be able to attend

15   to her family's needs at the moment and deal with the emergency

16   that her husband and daughter-in-law are facing.  And then,

17   Ms. Halverson, you can arrange for Ms. Bissey to turn herself

18   in at a time that will be agreed to.

19       Ms. Bissey, I say this in just about every case, and I say

20   this to you, ma'am.  We are not the worst thing we've ever done.

21   You are not the worst thing you've ever done.  You've lived a

22   productive life.  You have many people who love and support you.

23   You have resources.

24       Many people who come in front of me for sentencing don't

25   have the advantage of the support that you have had and you will

1    continue to have.  I have no doubt that you're going to continue

2    to live a law-abiding life, and I wish you good luck, ma'am.

3       Is there anything else I need to address today?

4    Ms. Halverson?

5       MS. HALVERSON:  Nothing from defense.

6       THE COURT:  Mr. Rothstein?

7       MR. ROTHSTEIN:  Nothing from the government,

8    Your Honor.

9       THE COURT:  Ms. Willett, yes.

10       PROBATION OFFICER:  Yes, Your Honor.  Thank you.

11    Kelli Willett from the probation office.  With regard to

12    Ms. Bissey's self-surrender status, since the Bureau of Prisons

13    will be handling that designation, even though it's a 14-day

14    designation, I would like to ask the Court to consider giving

15    her the opportunity to self-surrender after the new year, after

16    January 1, in order to let her handle her family situation and

17    also consult with her doctor to see his advice on whether or not

18    she should be vaccinated and go forward with that if she decides

19    to go that way, Your Honor.

20       THE COURT:  Absolutely.  Absolutely.  You may turn

21    yourself in after the 1st of the year, Ms. Bissey, and make

22    arrangements both for your family's care and for your own

23    medical care.

24       PROBATION OFFICER:  Thank you, Your Honor.

25       THE DEFENDANT:  Thank you.

1          PROBATION OFFICER:  One other matter.  The community

2     service, did the Court want to set a deadline for the community

3     service?

4          THE COURT:  The community service needs to be

5     completed by the end of next year, by the end of 2022.

6          PROBATION OFFICER:  Yes, Your Honor.  Thank you.

7          THE COURT:  Thank you all.

8          THE DEFENDANT:  Thank you, Your Honor.

9          THE COURT:  Good luck, Ms. Bissey.

10       (Proceedings adjourned at 2:54 p.m.)

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter. *


                         _/s/ Bryan A. Wayne_
                         Bryan A. Wayne


* PLEASE NOTE:

This hearing was taken via videoconference in compliance
with U.S. District Court standing order(s) during the COVID-
19 pandemic.  Transcript accuracy may be affected by the use
of electronic technology, including but not limited to sound
distortion or audiovisual interference.